IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

Plaintiff,

ALFONZO WILLIAMS,

Intervenor-Plaintiff,

v.

SOUTHERN HAULERS, LLC,

Defendant.

CIVIL ACTION NO. 11-00564-N

ORDER

This action is before the Court on a motion for partial summary judgment (docs 104-105) filed by the Equal Employment Opportunity Commission ("EEOC"), plaintiff herein, and on a motion for summary judgment (docs. 107-109) filed by the defendant, Southern Haulers, LLC ("Southern Haulers"). This action has been referred to the undersigned Magistrate Judge (doc. 19) pursuant to the consent of the parties (doc. 18) to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73. Upon consideration of these motions (docs. 104-105, 107-109), the briefs filed in opposition thereto (docs. 111-112, 115, 117)[1], the parties' replies (docs. 124, 131)[2], the supplemental briefs (docs. 130, 132, 135, 139-140), and all other

[1] Plaintiff-Intervenor Alfonzo Williams adopted and incorporated (doc. 117) the arguments and evidence presented by the EEOC in opposition to Southern Haulers' motion for summary judgment.

[2] Southern Haulers' motion (doc. 129) for leave to file a reply brief (doc. 131), which exceeds the Court's page limitations, was granted on February 13, 2013 (doc. 133).

pertinent portions of the record, the Court concludes that the EEOC's motion for partial summary judgment (doc. 104-105) is due to be **DENIED as MOOT** and that Southern Haulers' motion for summary judgment (docs 107-109) is due to be **GRANTED**.

In addition to the aforementioned cross-motions for summary judgment, the EEOC has filed a motion to exclude Southern Haulers' experts (doc. 122), Southern Haulers has filed a brief in opposition (doc. 137), and the EEOC has filed a reply (doc. 141). In view of the decision that Southern Haulers is entitled to summary judgment in this case, which is not predicated on the evidence challenged in this motion to exclude, it is **ORDERED** that the motion to exclude is hereby **DENIED as MOOT**.

## I. BACKGROUND

The EEOC filed this action on September 30, 2011, pursuant to Sections 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-5(f)(1) ("Title VII") and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a. (Doc. 1 at ¶ 1). An Amended Complaint was filed on November 16, 2011 (Doc. 4). The EEOC alleges that, since April 2009, Southern Haulers engaged in discriminatory hiring practices against Alfonzo Williams and a class of African-Americans, which includes only Alton Kelly, at Southern Haulers' Brewton terminal. (Doc. 4 at ¶ 7). The Complaint specifically alleges that Southern Haulers discriminated against Mr. Williams and other African-American applicants at its Brewton, Alabama terminal when it failed to hire them. (Doc. 4, at 1).

Alfonzo Williams was granted leave of Court to intervene (doc. 24) and filed his Complaint on February 1, 2012 (doc. 25). Williams' Complaint tracks the EEOC's Complaint in all material aspects. *Cf.* Docs. 4 and 25.

## II. FINDINGS FACTS[3]

1. Southern Haulers is a limited liability corporation owned by R&J Trucking, Inc. ("R&J"), a corporation based out of Youngstown, Ohio. (Doc. 109-1 at 9; Doc. 115 at p. 14 ¶ 1). Southern Haulers and R&J share personnel in accounting, payroll, accounts payable and receivable, safety, and human resources. (Doc. 109-1 at 9, 12; Doc. 115 at p. 14 ¶ 2).

2. Southern Haulers has three terminals in Alabama: one in Brewton, one in Calera, and one in Decatur. (Doc. 109-1 at 15; Doc. 115 at p. 14 ¶ 3).[4] Each terminal operates independently of one another to the extent that the terminal manager alone determined whether he had "enough trucks filled by drivers to handle the freight out of his terminal." (Doc. 109-1 at 19).[5] Truck drivers are hired specifically for one terminal,

---

[3] The court is mindful of its obligation under Rule 56 to construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *see also* Skop v. City of Atlanta, GA, 485 F.3d 1130, 1136 (11th Cir.2007). Any factual dispute will be resolved favor of the plaintiff when sufficient competent evidence supports plaintiff's version of the disputed facts. *See* Pace v. Capobianco, 283 F.3d 1275, 1276, 1278 (11th Cir.2002) (a court is not required to resolve disputes in the nonmoving party's favor when that party's version of events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." Ellis v. England, 432 F.3d 1321, 1326 (11th Cir.2005) (per curiam) (citing Bald Mountain Park, Ltd. v. Oliver, 863 F.2d 1560, 1563 (11th Cir.1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir.1990) (citing Anderson, 477 U.S. at 252)).

[4] Calera, Alabama is approximately 161 miles (2 hours) from Brewton, Alabama. Decatur, Alabama is approximately 273 miles (4 hours) from Brewton, Alabama.

[5] The EEOC alleges that this fact is disputed but has failed to proffer sufficient evidence to refute the evidence submitted by Southern Haulers. The EEOC asserts that "Thomas Burch on occasion was given assignments originating from Calera and Decatur by the Calera Dispatcher, Dan Roy." (Doc. 115 at 14, *citing* Doc. 116-9 at 5). The excerpt of Mr. Burch's deposition cited by the EEOC merely states as follows:

(Continued)

and they work exclusively from that terminal. (Doc. 109-1 at 19).[6] For example, if the applicant was seeking a truck driving job in the Brewton, he would have to complete an application at the Brewton terminal. (Doc. 109-1 at 47).[7]

3. At the time of his deposition in 2012, Rob Reed ("Reed") had served for sixteen and one half years as Vice-President of Finance for R&J and remains so employed. (Doc. 109-1 at 9; Doc. 115 at p. 14 ¶ 6). From April 1, 2003 through April

---

Q: I'm sorry. What was your interaction, for example, with the Calera terminal? Meaning, what types of assignments were you being dispatched with from Calera?

A: From Calera it was all dump trailer assignments.

(Doc. 116-9 at 5). The EEOC also asserts that "[Southern Haulers'] terminals would forward employment applications to each other upon receipt from internet." (Doc. 115 at 14, *citing* Doc. 116-3 at 9-10). However, the excerpt of John Triezenberg's deposition cited by the EEOC, with a portion added by the Court for continuity, states only the following:

Q: Are you familiar with Southern Hauler's online job application?

A: Not really.

Q: Have you –

A: I know its their [sic]. But the job application – if somebody fills a job application out on line that does come to my terminal. I believe it goes to either corporate office or to the Calera terminal and then they were [sic] would forward it to us which they have forwarded applications to us.

Q: During your term of employment with Southern Haulers have you ever forwarded an application to another terminal for a truck driving position?

A: I don't believe so.

(Doc. 116-3 at 9-10).

[6] The EEOC alleges that this fact is disputed but relies solely on the evidence set forth in n.1, *supra*. Thus, the EEOC has failed to proffer sufficient evidence to contradict the evidence submitted by Southern Haulers in support of this fact.

[7] However, an individual currently employed at one of the facilities would not have to complete an application in order to transfer to one of Southern Haulers other two terminals. (Doc. 109-1 at 65)

13, 2012, Daniel Fire ("Fire") served as Corporate Safety Director for R&J. (Doc. 109-1 at 14; Doc. 109-2 at ¶ 2; Doc. 115 at p. 14 ¶ 6).

4. John Triezenberg ("Triezenberg") has been the Terminal Manager of Southern Haulers' Brewton terminal since approximately 2007. (Doc. 109-3 at 6; Doc. 115 at p. 14 ¶ 7). As Terminal Manager, Triezenberg determined when to fill his trucks with drivers based on the freight available in his area[8], and therefore when to accept applications for truck driver positions to forward to corporate. Triezenberg did not have authority to hire a truck driver for Southern Haulers. (Doc. 109-1 at 15-16; Doc. 109-3 at 20).[9] Triezenberg characterized his role in the hiring process, in pertinent part as follows:

> The driver comes in -- if we are accepting applications, a driver comes in and fills out an application. I review it for -- to make sure that it's filled out completely. And then I forward it up to our safety department and they will do the background checks if we are hiring.

(Doc. 116-3 at 7). Triezenberg further testified that he did not forward ***any*** applications for hire in 2009. (Doc. 116-3 at 7)(emphasis added).[10] Although Triezenberg could not

---

[8] *See e.g.*, Doc. 116-1 (Southern Haulers' 30(b)(6) transcript)("Each terminal manager would make their own determination ***if they needed their trucks filled*** [and] [i]n 2009 . . .[had] the sole authority to ***post*** for open positions." )(emphasis added).

[9] The EEOC alleges that this is a material issue in dispute based on Alfonzo Williams's contention that Triezenberg, when asked, "was they hiring any drivers," told him "I'm not hiring and I never will be." (Doc. 116-5 at 5). The EEOC charge signed by Alfonzo Williams on May 9, 2009, states that Triezenberg's remark was "We are not hiring and I don't believe we will ever be hiring again." (Doc. 105-1 at 1; Doc. 115 at 2). The EEOC has proffered no evidence to contradict the evidence presented by Southern Haulers that all hiring decisions with regard to truck drivers were made by Daniel Fire, at all relevant time the Corporate Safety Director of the parent corporation, R&J. (Doc. 109-1 at 13; Doc. 109-2 at ¶¶ 3, 5, 6).

[10] The EEOC incorrectly characterized this testimony as being that "Triezenberg did not forward ***all*** applications to the Safety Department." (Doc. 115 at ¶ 8 and n. 99, *citing* Doc. 116-3 at 7)(emphasis added).

recall taking any applications when he was not hiring in 2007, 2008, and the first quarter of 2009, if he took an application when he was not hiring, he kept it on his office windowsill "for a minimum of ninety days and then I would discard them." (Doc. 109-3 at 7, 19; Doc. 116-3 at 10). Triezenberg stated that there may have been times when he held on to applications longer than ninety days, but it was only because "I don't go through that stack everyday." (Doc. 109-3 at 23; Doc. 116-3 at 10). No evidence has been proffered that any truck driver was ever hired based on an application received by Triezenberg during a time defendant was not hiring drivers, specifically during 2009, but held onto for more than ninety days.

6. Reed testified that, "[i]f we were hiring the Brewton terminal would have a sign put outside on their – put on the fence outside the fence . . . [and] we may run ads in the local papers for the respective terminals." (Doc. 109-1 at 15).

7. Triezenberg testified that he "did not recall" advertising in any newspaper, posting a notice on the bulletin board outside of Southern Haulers, or sending any "feelers" out about a truck driving position available around the time Mr. Bartlett was hired on April 24, 2008, or having at that time "any new contract or business that necessitated hiring a driver." (Doc. 116-3 at 9). Triezenberg does not advertise open truck driving positions on the internet. (Doc. 109-3 at 15; Doc. 115 at p. 15 ¶ 11).[11]

---

[11] Consistent with Triezenberg's testimony, Thomas Brown testified that, prior to being hired in 2010, he had not ever seen any notices that Southern Haulers was hiring or looking for truck drivers or any postings on any websites. (Doc. 116-7 at 4). Brown also testified that Triezenberg, in 2010, brought an application for Brown to Brown's wife, a waitress who served Triezenberg his lunch every day. According to Brown:

> My wife worked at the Shell station right next door to Southern Haulers and John goes in there every day for lunch. And days I wasn't working I went up there and was aggravating John

(Continued)

8. Daniel Fire ("Fire"), the former Corporate Safety Director, made all hiring decisions with regard to truck drivers at the Brewton Terminal through April 13, 2012. (Doc. 109-2 at 2-3; Doc. 109-1 at 14).[12] In 2008, Southern Haulers hired five drivers for the Brewton terminal. (Doc. 109-4 at ¶ 8; Doc. 115 at 16). Two of these five drivers were African-Americans, namely Lamont Holland ("Holland") and James Durant ("Durant"). (Doc. 109-4 at ¶ 9). Holland and Durant personally presented their applications to Triezenberg, who forwarded them to Fire, who made the decision to hire them. (Doc. 109-4 at ¶¶ 7, 9, 10).[13]

9. Prior to 2009, truck drivers at the Brewton terminal primarily picked up Municipal Solid Waste from "transfer stations" and delivered it to landfills on a daily basis. (Doc. 109-1 at 24; Doc. 115 at p. 17 ¶¶ 24-25). In August 2008, Southern Haulers

---

> about a job. And in 2010, John came to my wife and gave her an application and told her to tell me to fill it out. And a couple days later I got hired.

(Doc. 116-7 at 4). Thomas Burch also testified that, before submitting an application on March 17, 2010, he had not seen any type of posting for the position of truck driver either on Southern Haulers facility or on a billboard on Southern Haulers' property. (Doc. 116-9 at 3) Burch had previously sought employment at Southern Haulers but was told they "didn't have anything available," even part-time. (Doc. 116-9 at 3). When Reo Pugh asked for work at Southern Haulers on April 19, 2010, he was told that "they was slow" but he could fill out an application if he wanted to. (Doc. 116-8 at 2). He had not seen any billboard advertising for Southern Haulers or any postings on their terminal. (Doc. 116-8 at 2). Pugh was hired by Southern Haulers on May 5. 2010. (Doc. 116-8 at 3).

[12] *See* n. 8, *supra*.

[13] The EEOC contends that Triezenberg's role in the hiring of Holland and Durant is somehow irrelevant because they "were hired for special assignment out of Florida [and] did not work from the Brewton terminal." (Doc. 115 at 17, *citing* "Exhibit C- Triezenberg Dep. Pg. 67:4-70:12" but offering only Doc. 116-3 at 8, which has Pg. 67:4-22 but no Pg. 70; but *see* Doc. 109-3 at 21). Holland, Durant and a third driver similarly hired for the Pensacola, Florida assignment were nonetheless employees assigned to and supervised by Triezenberg. (Doc. 109-3 at 20-21, 22-23).

lost its business with the Biloxi, Mississippi transfer station. (Doc. 109-3 at 32).[14] Starting in late November or early December 2008 and continuing through 2009, Southern Haulers' revenue was down about thirty-five percent due to the loss of business and the poor economy. (Doc. 109-1 at 39).[15] In the first quarter of 2009, Southern

[14] The EEOC does not dispute Southern Haulers' loss of business and revenue but contends that it is "immaterial." (Doc. 115 at p. 17 ¶ 26). The EEOC claims that "Southern Haulers was still accepting applications ***through 2009*** including for employment at the Brewton Terminal." (Doc. 115 at p. 17 n. 111, *citing* Doc. 116-3 at 6, emphasis added). However, the EEOC has submitted no evidence to contradict Triezenberg's testimony on this issue. Triezenberg testified as follows:

> Q: In 2009 did you accept employment applications for truck driving positions even when Southern Haulers was not hiring?
>
> A: In 2009 I quit accepting applications.
>
> Q: Is it your testimony that at no time in 2009 you accepted an employment application . . . for a truck driving position?
>
> A: No, I won't say that. I stopped taking applications in the first quarter of 2009.
>
> Q: And why did you stop taking applications in the first quarter of 2009?
>
> A: In the third and fourth quarter of 2008 we lost a customer. In the first quarter of 2009 we lost another customer, which displaced eight to nine drivers.
>
> Q: Did you have a layoff in 2009?
>
> A: We did not lay anyone off in 2009 that I recall. We did have a couple of drivers who left us.
>
> * * *
>
> Q: When did Southern Haulers resume accepting applications?
>
> A: I believe we started accepting applications when we picked up an additional customer at the end of 2009 or beginning of 2010.

(Doc. 116-3 at 6).

[15] The EEOC does not dispute this fact but argues that it is "immaterial." (Doc. 115 at p. 17 ¶ 27).

Haulers lost its business with the Prattville, Alabama transfer station when the station was hit by a tornado. (Doc. 109-3 at 17-8, 32).[16]

10. The Prattville transfer station was never rebuilt, and Southern Haulers never regained the lost business, which displaced approximately nine (9) drivers from the Brewton terminal. (Doc. 109-3 at 17-18, 32).[17] Triezenberg met with the drivers to explain the slow down and placed some of the drivers at the Brewton Terminal on four-day workweeks as an alternative to layoffs. (Doc. 109-3 at 18, 34).[18]

11. Triezenberg stopped accepting applications for truck driver positions during the first quarter of 2009, (before the end of March 2009), because there was no need to hire truck drivers. (Doc. 109-3 at 17; Doc. 109-4 at 4; Doc. 109-1 at 15).[19] Southern

---

[16] The EEOC does not dispute this fact but argues that it is "immaterial." (Doc. 115 at p. 17 ¶ 29).

[17] The EEOC does not dispute this fact but argues that it is "immaterial." (Doc. 115 at p. 18 ¶ 30).

[18] The EEOC does not dispute this fact but argues that it is "immaterial." (Doc. 115 at p. 18 ¶ 31). The EEOC also contends that "Southern Haulers hired drivers even when business was slow." (Doc. 115 at p. 18 ¶ 31). As its proof, the EEOC cites the testimony of Reo Pugh:

> Q: And can you tell me exactly what happened on that date when you went to the terminal?
>
> A: Only thing, I just come in and asked if he was hiring and he said they was slow and – but he told me I could try if I wanted to, so I filled the application out. And a few days later I went to work. A few days later. I can't remember the date.

(Doc. 116-8 at 2). The EEOC does not dispute that Pugh submitted the subject application on April 19, 2010, and was hired by Fire on May 5, 2010, to work with a new customer which Southern Haulers acquired in January 2010. (Doc. 108 at ¶¶ 86, 94-95; Doc. 115 at p. 23 ¶¶ 94-95, p. 22 ¶ 86).

[19] The EEOC does not dispute this fact but argues it is immaterial. (Doc. 115 at p. 18 ¶ 32). This argument is predicated in part on Williams' testimony that Triezenberg told him that Southern Haulers would never be hiring again. (Doc. 115 at p. 18 ¶ 32; Doc. 116-5 at 5). *Cf.* Williams' EEOC Charge, stating that on April 15, 2009, Triezenberg told him "We are not hiring and I don't believe we will ever be hiring again." (Doc. 105-1 at 1). The EEOC's present argument is also predicated on Brown's testimony that "throughout 2009" Triezenberg told him "If work became available, he would be considered for employment." (Doc. 115 at p. 18 ¶ 32, *citing* Doc. 116-7 at 2). The excerpt of Brown's deposition relied upon by the EEOC contains no indication that Triezenberg told Brown on more than a single occasion when he submitted an application in 2008 that "when he got ready to hire he would let me (Continued)

Haulers did not have any vacant truck driving positions at its Brewton terminal in 2009. (Doc. 109-1 at 15; Doc. 109-3 at 17-18, 32; Doc. 109-2 at 3; Doc. 109-4 at 3).[20]

12. Alfonzo Williams testified that, a "couple of months" before April 2009, he began talking to random truck drivers at the Chevron gas station in Brewton whom he believed to be employed by Southern Haulers. (Doc. 109-6 at 17; 24; Doc. 115 at p. 19 ¶ 37). Williams claims that each truck driver he spoke with told him that Southern Haulers was hiring. (Doc. 109-6 at 24; Doc. 115 at p. 19 ¶ 38). Williams cannot identify any of the truck drivers with whom he spoke. (Doc. 109-6 at 24; Doc. 115 at p. 19 ¶ 39). The EEOC states it is undisputed that the only information Williams could provide concerning these truck drivers is that they were "white" and "all looked the same." (Doc. 108 at p. 8 ¶ 40; Doc. 115 at p. 19 ¶ 40).[21]

13. Sometime in March 2009, Williams talked to Southern Haulers' truck drivers on his CB radio who told him that Southern Haulers was hiring. (Doc. 108 at p. 8 ¶ 41, *citing* Doc. 109-6 at 20; Doc. 115 at p. 19 ¶ 41). Williams cannot identify any of the drivers with whom he spoke on the CB. (Doc. 109-6 at 20; Doc. 115 at p. 19 ¶ 42).

---

know and I can come and fill out another application." (Doc. 116-7 at 2). No evidence has been proffered that Brown's 2008 application was held more than ninety days, as was the custom at the Brewton terminal. (Doc.109-3 at 7, 19, 23; Doc. 116-3 at 10). There is, in fact, no evidence as to precisely when in 2008 Brown submitted an application.

[20] The EEOC does not dispute this fact but argues it is immaterial for the same reasons previously cited in n. 15. (Doc. 115 at p. 18 ¶ 33).

[21] In the deposition excerpt relied on to support this finding, Williams states that he had never seen these drivers before and would not be able to recognize them if he saw them again. (Doc. 109-6 at 24).

14. On April 13, 2009, Williams spoke to a Caucasian man "inside the fence" at the Brewton terminal who told him Southern Haulers was hiring. (Doc. 109-6 at 20; Doc. 115 at p. 19 ¶ 43). Williams does not know the name of this man, his position, or whether he had the authority to hire truck drivers. (Doc. 109-6 at 20; Doc. 115 at p. 19 ¶ 44). When Williams asked if they were hiring truck drivers, the man told him "Yeah, they need plenty of drivers." (Doc. 109-6 at 20). The man also told Williams that the "guy" who did "the hiring" would be there at 7:30 the next morning. (Doc. 109-6 at 20; Doc. 115 at p. 19 ¶ 45).

15. On April 14, 2009, Williams went to the Brewton terminal to talk to the "guy." (Doc. 109-6 at 20; Doc. 115 at p. 19 ¶ 46). Williams entered Triezenberg's office unannounced and spoke to a Caucasian man he believed to be John Triezenberg. (Doc. 109-6 at 21).[22] Williams had never before seen Triezenberg. (Doc. 109-6 at 27; Doc. 115 at p. 19 ¶ 48).

---

[22] The EEOC contends that this fact must be "[d]isputed as written." (Doc. 115 at p. 19 ¶ 47). The EEOC contend that it "mischaracterizes the testimony [because] Williams . . . was invited to come inside the terminal by Defendant's mechanics." (Doc. 115 at p. 19 ¶ 47). Williams actually testified as follows:

> Q: And what was your understanding of what John's job was?
>
> A: Well, he was sitting at the desk. I figured that he was the one doing the hiring. He was the only one there.
>
> Q: Was his office like a separate room?
>
> A: Yes. It was a room. It was sitting back of the shop.
>
> Q. Had you called him ahead of time?
>
> A: No.
>
> Q: So he wasn't expecting you to be there, to your knowledge?
>
> A: I had tried calling a few times, but I never could get an answer.

(Continued)

16. Williams asked Triezenberg "if they [were] hiring any drivers." (Doc. 109-6 at 21; Doc. 115 at p. 19 ¶ 49). The man Williams believed to be Triezenberg said, "I'm not hiring and I never will be hiring." (Doc. 109-6 at 21; Doc. 115 at p. 19 ¶ 50). Williams then asked, "[W]ell can I put in an application?" (Doc. 109-6 at 21; Doc. 115 at p. 19 ¶ 51). Triezenberg responded, "[D]idn't I just tell you I'm not hiring and I never will be hiring?" (Doc. 109-6 at 21; Doc. 115 at p. 20 ¶ 52). Williams then took a business card off Triezenberg's desk. (Doc. 109-6 at 21; Doc. 115 at p. 20 ¶ 53).[23] Triezenberg requested the business card back, scratched through his cell phone number

---

> Q: So you didn't talk to him before you showed up at the office, correct?
>
> A: No, I didn't talk to him.
>
> Q: So he was sitting behind his desk. Did you knock on the door?
>
> A: No. The guys in the mechanic shop told me just to walk on in.

(Doc. 109-6 at 21).

[23] The EEOC contends that this fact, although "[u]ndisputed," is "materially incomplete. (Doc. 115 at p. 20 ¶ 53). The EEOC further contends that "Williams asked for the business card so that in the event Southern Hauler's would begin to hire again, Williams had a way to contact Triezenberg directly." (Doc. 115 at p. 20 ¶ 53, *citing* Doc. 116-5 at 5). Williams testified:

> Q: So what happened after he said [Didn't I just tell you I'm not hiring and I will never be hiring?]?
>
> A: When he said that, I looked on the desk and I seen one of his business cards. And while I was telling him, Well, let me get one of your business cards so at least I can call you just in case you change your mind. So I reached and got one of his cards off the desk.
>
> Q: Did he tell you you couldn't have his business card?
>
> A: Yeah – He told me, he said, Give it back – He said can I hold that? I said, Yeah. I gave it back to him. He took a pen and scratched his cell phone number off and throwed it back to me.

(Doc. 116-5 at 5-6).

and returned the card. (Doc. 109-6 at 21; Doc. 116-5 at 5-6).[24] Williams then left the office. (Doc. 109-6 at 21; Doc. 115 at p. 20 ¶ 55).

17. Triezenberg does not recall speaking to Williams on any date. (Doc. 109-3 at 26-27; Doc. 115 at p. 20 ¶ 56). Triezenberg testified that he has at "numerous times" scratched out his cell phone number from his business cards, which leaves only the office number. (Doc. 109-3 at 26-27). He does this "so I don't have sales people or what have you calling me on Sunday or Saturday, Wednesday night when I'm out with my wife or whatever." (Doc. 109-3 at 27). Williams has acknowledged that the office number still appeared on the business card he took from Triezenberg's desk. (Doc. 109-6 at 34).

18. Williams believes that Southern Haulers discriminated against him on the basis of his race because of how Triezenberg treated him. (Doc. 109-6 at 31, 43; Doc. 115 at p. 20 ¶ 57). Williams testified that he had no evidence that Triezenberg treated anyone else, black or white, any differently. (Doc. 109-6 at 33; Doc. 115 at p. 21 ¶ 62). Williams also testified that he would feel differently if Triezenberg had allowed him to apply for a job, even if he then threw it in the trash. (Doc. 109-6 at 23; Doc. 115 at p.20 ¶ 60).[25] Williams never again contacted Triezenberg or Southern Haulers. (Doc. 109-6 at

---

[24] Despite Williams testimony as set forth in n. 22, *supra*, the EEOC contends that "[i]nitially, Triezenberg told Williams he could not have his business card." (Doc. 115 at p. 20 ¶ 54). However, this contention is not supported by the record.

[25] The EEOC contends that this fact is immaterial because, *inter alia,* in addition to being rude and not allowing Williams to complete an employment application, Triezenberg "allowed white applicants with far less qualifications to complete applications, processed them, and then offered them truck driving positions with Southern Haulers." (Doc. 115 at p. 20 ¶ 59). The EEOC fails to identify any applicant who even submitted an application to Triezenberg in 2009. Instead, the EEOC contends that Triezenberg accepted an application from Thomas Brown at some unspecified time in 2008 and then surmises that Triezenberg hung onto that application until he could hire Brown in 2010. There is, however, no evidence in this record that any application submitted to Triezenberg in 2008 was held more than ninety days as was the custom. In contrast, the evidence of record establishes that Thomas Brown's (Continued)

21; Doc. 115 at p. 20 ¶ 61). Williams further testified that he knows of no other person who physically went to the Brewton terminal to inquire about a truck driving position after the first quarter of 2009 and was allowed to apply. (Doc. 109-6 at 29; Doc. 115 at p.21 ¶ 63). Other than his son-in-law, Alton Kelly, who inquired by telephone in May or June 2009, Williams knows of no other African-American who inquired about a truck driving position at the Brewton terminal in 2009. (Doc. 109-6 at 29; Doc. 115 at p. 21 ¶ 64). Nor does Williams know of any truck driver who was hired at the Brewton terminal in 2009 or at any time after his inquiry. (Doc. 109-6 at 38).[26] Williams did not see any type of advertisement, either in the newspaper or on Southern Haulers' fence, regarding the open truck driver positions. (Doc. 109-6 at 17, 39; Doc. 115 at p.21 ¶ 66).

19. Alton Kelly met someone he believed to be a Southern Haulers' truck driver at a Brewton gas station in May or June 2009 who told him Southern Haulers was hiring truck drivers. (Doc. 109-7 at 15; Doc. 115 at p. 21 ¶ 67). Kelly does not know the truck driver's name and cannot recall what he looks like. (Doc. 109-7 at 12, 15; Doc. 115 at p. 21 ¶ 68). Kelly never visited the Brewton terminal and only made one telephone inquiry in June 2009 about whether Southern Haulers was hiring truck drivers. (Doc. 109-7 at 12-13, 29). When Kelly called Southern Haulers in June 2009, he spoke with a

---

employment by Southern Haulers on February 1, 2010, was pursuant to an application filed on January 7, 2010. *See* n. 19, *supra* and n. 28, *infra*.; Finding # 21 and n. 32, *infra*.

[26] The EEOC contends that this fact is "[d]isputed , but immaterial." (Doc. 115 at p. 21 ¶ 65, *citing* only the unsupported contention set forth in response to Southern Haulers' "Undisputed Fact # 59"). *See* n. 25, *supra*.

man but does not know his name[27] and only assumes he was Caucasian. (Doc. 109-7 at 13, 16; Doc. 115 at p. 21 ¶ 72). During his one telephone call to Southern Haulers, the person who answered the phone told Kelly there was no reason to apply because Southern Haulers was "not hiring right now, and that was the end of the conversation." (Doc. 115 at p. 21 ¶ 69, *citing* Doc. 109-7 at 13). Triezenberg does not recall ever having a conversation with Kelly. (Doc. 109-3 at 28; Doc. 115 at p. 22 ¶ 85).

20. Kelly never identified himself as African-American. (Doc. 109-7 at 16). Kelly testified that he believes that Southern Haulers denied him "the ability to submit an application because [he] was black based on the sound of his voice." (Doc. 109-7 at 16; Doc. 115 at p. 22 ¶¶ 78, 79).

21. Kelly believes that he should have been allowed to submit an application even if Southern Haulers was not hiring. (Doc. 109-7 at 15-16; Doc. 115 at p. 22 ¶ 80). Kelly also testified that he does not know how the unidentified male with whom he spoke on the phone treats or speaks to other callers. (Doc. 109-7 at 30; Doc. 115 at p. 22 ¶ 82). Kelly's sole basis for believing that Southern Haulers was hiring truck drivers was the unidentified man he met at a Brewton gas station. (Doc. 109-7 at 14-15; Doc. 115 at p. 22 ¶ 83). Kelly does not know of any truck driver hired by Southern Haulers for its Brewton terminal after his inquiry. (Doc. 109-7 at 29; Doc. 115 at p. 22 ¶ 84).[28]

---

[27] Kelly testified that the man did not identify himself and Kelly did not ask his name but, instead, Kelly introduced himself and only asked if they were hiring. (Doc. 109-7 at 3; Doc. 115 at p. 21 ¶ 73). Reed testified that, in addition to Triezenberg, the phone could have been answered by Vince Howlett, the Maintenance Manager at the Brewton terminal. (Doc. 109-1 at 20-21).

[28] The EEOC asserts that "Southern Haulers engaged in a sustained period of hiring, including the hiring of three white drivers who submitted in-person applications to the Brewton terminal. (Doc. 115 at (Continued)

20. In January 2010, Southern Haulers obtained a new customer, Schnitzer Southeast ("Schnitzer"), a scrap dealer. (Doc. 116-3 at 32; Doc. 115 at p. 22 ¶ 86).[29] The dump trucks used to haul scrap metal are different from the tipper trucks used by Southern Haulers to haul solid waste. (Doc. 116-3 at 32; Doc. 115 at p. 23 ¶ 87). Triezenberg determined that, as a result of the new relationship with Schnitzer, he needed to hire dump truck drivers for the Brewton terminal to haul the scrap metal. (Doc. 109-3 at 32).[30] Triezenberg began accepting applications for truck drivers at the Brewton terminal in January 2010. (Doc. 109-3 at 32; Doc. 109-2 at ¶ 17).[31]

---

p. 22 ¶ 84, *citing* Doc. 116-2 at 4-7). Of the documents relied on by the EEOC, only one (doc. 116-2 at 7) refers to the Brewton terminal but, although providing barely legible names of employees, is undecipherable with respect to the relevant "DATE OF HIRE" and the EEOC makes no effort to explain the evidence. (Doc. 115 at p. 22 ¶ 84, *citing* Doc. 116-2 at 4-7). The "three white drivers" referred to by the EEOC appear to include Thomas Brown, Thomas Burch and Reo Pugh. (Doc. 116-2 at 7). These drivers, however, did not apply and were not hired until 2010, more than six to eight months following Williams visit to Southern Haulers' Brewton terminal and Kelly's phone call. *See* Doc. 116-7 at 2, 4 (Thomas Brown submitted his application in 2010 and was hired within a couple of days on February 2, 2010); Doc. 116-9 at 2, 5 (Thomas Burch submitted his application on March 17, 2010, and was hired April 13, 2010); Doc. 16-8 at 2, 3 (Reo Pugh submitted application on April 19, 2010 and was hired May 5, 2010). These three men also applied and were hired either immediately before or after Kelly, in March 2010, had back surgery and submitted an application for Social Security disability claiming to be "unable to perform work as a truck driver." (Doc. 109-7 at 9). Additionally, Kelly testified that, with respect to his back pain prior to his surgery in March 2010, for "[a]bout six months I went back and forth to the doctor and was taking medication, going to therapy and none of it worked." (Doc. 109-7 at 8-9). These three drivers did not apply and were not hired until after Kelly's back pain became such a problem that he sought a surgical resolution which incapacitated him for "about a year and a half" and led to his application for permanent disability." (Doc. 109-7 at 8).

[29] The EEOC's contention that "[r]egardless of customer accounts, Southern Haulers began a sustained period of hiring for truck drivers beginning in July 2009" is not supported by the record. *See* n. 25 and n. 28, *supra*.

[30] The EEOC states that this fact is disputed (doc. 115 at p. 23 ¶ 88), but then refers to an earlier response in which it declares that the fact is "undisputed but materially incomplete" (doc. 115 at p. 22 ¶ 86). Despite this inconsistency, the evidence of record establishes the fact and its materiality. *See* n. 25 and n. 28, *supra*.

[31] The EEOC disputes this fact on the grounds that "[t]here is no evidence that Triezenbach accepted more than the three (3) applications from the successful white applicants, who each applied with[in] a span of three months." (Doc. 115 at p. 23 ¶ 89). The EEOC acknowledges, however, that (Continued)

21. On January 7, 2010, Thomas "Josh" Brown, a Caucasian, submitted an application to the Brewton terminal for a truck driver position. (Doc. 109-3 at 30; Doc. 115 at p. 23 ¶ 90).[32] Triezenberg forwarded this application to Fire, who hired Brown on February 1, 2010, which was within 90 days of his application date. (Doc. 109-3 at 30; Doc. 109-2 at ¶¶ 13-14; Doc. 109-4 at ¶ 17; Doc. 115 at p. 23 ¶ 91).[33]

22. On March 17, 2010, Thomas "Rocky" Burch, a Caucasian, submitted an application to the Brewton terminal for a truck driver position. (Doc. 109-3 at 30; Doc. 115 at p. 23 ¶ 92). Triezenberg forwarded this application to Fire, who hired Burch on April 13, 2010, which was within 90 days of his application date. (Doc. 109-3 at 30; Doc. 109-2 at ¶¶ 13-14; Doc. 109-4 at ¶ 17; Doc. 115 at p. 23 ¶ 93).

23. On April 19, 2010, Reo Pugh, a Caucasian, submitted an application to the Brewton terminal for a truck driver position. (Doc. 109-3 at 31; Doc. 115 at p. 23 ¶ 94). Triezenberg forwarded this application to Fire, who hired Burch on May 5, 2010, which was within 90 days of his application date. (Doc. 109-3 at 3; Doc. 109-2 at ¶¶ 13-14; Doc. 109-4 at ¶ 17; Doc. 115 at p. 23 ¶ 95).

---

Triezenberg "customarily discards applications . . . after a period of 90 days." (Doc. 115 at p. 23 ¶ 89, *citing* (Doc. 109-3 at 23).

[32] The EEOC does not dispute this fact but again challenges the materiality of Brown's 2010 application because he is alleged to have been "allowed to submit an in-person application in 2008." (Doc. 115 at p. 23 ¶ 90, *citing* Doc. 116-7 at 2). The EEOC acknowledges, however, that Triezenberg "customarily discards applications . . . after a period of 90 days." (Doc. 115 at p. 23 ¶ 89, *citing* (Doc. 109-3 at 23). *See also,* n. 25, n. 28, and n. 31, *supra*.

[33] The EEOC disputes that Brown was hired within 90 days of his application because the EEOC continues to argue that Brown was hired pursuant to an application submitted in 2008. (Doc. 115 at p. 23 ¶ 91). The record contains no evidence, however, either regarding the date of that 2008 application or establishing that the 2008 application was not discarded in the trash 90 days after submission as was the undisputed custom of Triezenberg.

24. There is no evidence that any African-American applied for any of the truck driver positions filled by Brown, Burch or Pugh. (Doc. 109-4 at ¶ 18; Doc. 115 at p. 24 ¶ 96).

25. In 2011, Southern Haulers hired eight truck drivers at the Brewton terminal. (Doc. 109-3 at 31-32; Doc. 115 at p. 24 ¶ 97). Four of these truck drivers are African-American. (Doc. 109-3 at 31-32; Doc. 109-4 at ¶¶ 20-22; Doc. 115 at p. 24 ¶ 98). In 2012, Southern Haulers hired four truck drivers at the Brewton terminal. (Doc. 109-3 at 31-32; Doc. 109-4 at ¶¶ 23-26; Doc. 115 at p. 24 ¶ 99). One of these truck drivers is African-American. (Doc. 109-3 at 31-32; Doc. 109-4 at ¶¶ 23-26; Doc. 115 at p. 24 ¶ 100). Triezenberg met each African-American who applied for these jobs, accepted their applications and forwarded those applications to the Corporate Safety Director. (Doc. 109-3 at 31; Doc. 109-4 at ¶¶ 10, 19, 22, 26; Doc. 115 at p. 24 ¶ 101).

26. Southern Haulers proffers the following evidence in support of its contention that Williams has failed to mitigate his damages. In this regard, Williams testified:

> Q. Well, do you have any plans of going to look for another job? Because I thought that you –
> A. In the future I probably will.
> Q. Well, do you have any estimation of when you're going to start looking for a job again?
> A. I can't say right now.
> Q. Is there anything in particular you're waiting on before you do that?
> A. The only thing I can do is drive a truck.
> Q. Okay. Well, what truck driving positions have you applied for since you left MSJ?
> A. I haven't applied for none.
> Q. And what's keeping you from applying?
> A. Just not ready yet.
> Q. And why are you not ready?

A. Just not ready to go to work yet.
Q. But why is that? What's keeping you from wanting to go back to work?
A. I mean, it's just me. It's not no personal thing. It's just me.

(Doc. 109-6 at 41; Doc. 115 at p. 24 ¶102).[34] Five to six months after being denied an opportunity to submit an application in April 2009 with Southern Haulers because they were not hiring truck drivers, Williams obtained employment with JR Trucking and worked there for three or four months. (Doc. 109-6 at 15; Doc. 115 at p. 24 ¶ 102). About one month after leaving JR Trucking, Williams went back to work at MSJ Trucking and worked there for "about five months." (Doc. 109-6 at 15; Doc. 115 at p. 24 ¶ 102).

27. Kelly suffered a back injury, which required surgery in March 2010. (Doc. 109-7 at 8-9; Doc. 115 at p. 24 ¶ 103). As a result of this surgery, Kelly was out of work for "about a year-and-a-half." (Doc. 109-7 at 8; Doc. 115 at p. 24 ¶ 104). Kelly thereafter filed an application for Social Security disability alleging an inability to work. (Doc. 109-7 at 8-9).

## II. CONCLUSIONS OF LAW.

### A. Standard of Review.

"The court shall grant summary judgment if the movant shows that there is no

[34] The EEOC states that this evidence "speaks for itself but materially [sic] incomplete." (Doc. 115 at p. 24 ¶ 102). The EEOC then asserts that "[s]ince being denied employment by Southern Haulers, Williams has worked a number of jobs, including both long haul and short haul assignments." (Doc. 115 at p. 24 ¶ 102). The EEOC specifically refers to jobs with JR Trucking and MSJ Trucking. (Doc. 115 at p. 24 ¶ 102). The EEOC does not dispute that the job with JR Trucking was not sought by Williams until five to six months after his inquiry to Southern Haulers and was kept for only three to four months, and Williams then waited a month to go back to work for MSJ Trucking for "about five months." (Doc. 115 at p. 24 ¶ 102).

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56(c) governs procedures and provides as follows:

> (1) *Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> >
> > (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> (2) *Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> (3) *Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.
>
> (4) *Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).

Southern Haulers, as the party seeking summary judgment, bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (*quoting* Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment. Lofton v. Sec'y of Dep't of Children & Family Servs., 358 F.3d 804, 809

(11th Cir. 2004).

If the non-moving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. In reviewing whether the non-moving party has met his burden, the Court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. Tipton v. Bergrohr GMBHSiegen, 965 F.2d 994, 998-99 (11th Cir. 1992) (internal citations and quotations omitted).

"The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.' " Bailey v. Allgas, Inc., 284 F.3d 1237, 1243 (11th Cir. 2002), *quoting* Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 249 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249–250. (internal citations omitted).

B. Title VII Race Discrimination.

This action was brought pursuant to Sections 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-5(f)(1) ("Title VII") and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a. (Doc. 1 at ¶ 1). The EEOC and Williams allege that, since April 2009, Southern Haulers engaged in discriminatory hiring practices against Alfonzo Williams and a class of African-Americans, which includes only Alton Kelly, at Southern Haulers' Brewton terminal.

(Doc. 4 at ¶ 7; Doc. 25 at ¶ 7).

Title VII makes it "an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e–2 (a)(1). "Whether an employer intentionally discriminated against an employee or potential employee is a question of fact, which may be proved either through direct or circumstantial evidence." EEOC v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1272 (11th Cir. 2002), *citing* Green v. Sch. Bd. of Hillsborough County, 25 F.3d 974, 977-78 (11th Cir. 1994). "Direct evidence of discrimination is evidence, that, 'if believed, proves [the] existence of [a] fact in issue without inference or presumption'. " (*Id.*), *quoting* Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999)(alterations in original).

The EEOC acknowledges that its case is predicated on circumstantial evidence. (Doc. 115 at 26). The EEOC's case must, therefore, be analyzed using the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and subsequent cases. Joe's Stone Crabs, 296 F.3d at 1272. Under this framework, the EEOC must initially establish a prima facie case of discrimination, which creates a rebuttable presumption that the employer unlawfully discriminated against the plaintiff-intervenor and his class. *Id., citing* McDonnell Douglas, 411 U.S. at 802; United States Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 714 (1983). If the EEOC establishes a prima facie case, the burden shifts to Southern Haulers to rebut the presumption that it discriminated by producing evidence that its action was taken for some legitimate, non-discriminatory reason. *Id., citing* Texas Dep't of Community

Affairs v. Burdine, 450 U.S. 248, 254-55 (1981). If Southern Haulers meets its burden of production, the presumption of discrimination is rebutted, and the inquiry "proceeds to a new level of specificity," in which the EEOC must show that the proffered reason really is a pretext for unlawful discrimination. *Id.* at 1272-73, *quoting* Burdine, 450 U.S. at 255-56. "Although the intermediate burdens of production shift back and forth, the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against the employee remains at all times with the plaintiff." *Id.* at 1273, *citing* Burdine, 450 U.S. at 253; Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000).

C. Analysis.

(1) Prima Facie Case.

In order to establish a prima facie case of failure to hire by Southern Haulers, the EEOC must show that: "(1) [Williams] was a member of a protected class; (2) [h]e applied and was qualified for a position for which the employer was accepting applications; (3) despite [his] qualifications, [h]e was not hired; and (4) the position remained open or was filled by another person outside of [his] protected class." Lane v. Broward County, Florida, 411 Fed.Appx. 272, 273 (11th Cir. 2011), *quoting* Joe's Stone Crabs, 296 F.3d at 1273.

Southern Haulers contends that the EEOC has failed to establish a prima facie case because it has failed to establish that Southern Haulers "was accepting applications or had truck driving positions available at its Brewton terminal at the times Williams and Kelly attempted to apply. (Doc. 108 at 18). The EEOC argues, in sum, that it has satisfied its prima facie burden because both Williams and Kelly did everything possible

to apply for a job as a truck driver at the Brewton terminal and, "[w]ithin a month of Kelly's employment inquiry [said to be by phone 'sometime between April 2009 and June 2009'], Southern Haulers hired 34 drivers began a sustained period of hiring between July 2009 and May 30, 2010[, including] twenty-two (22) drivers at its Calera facility, nine (9) drivers at its Decatur facility, and three (3) at its Brewton facility." (Doc. 115 at 29, 31, 32). Williams and Kelly did not, however, seek to apply at either the Calera or the Decatur terminals; they only sought to apply at the Brewton terminal because they lived nearby. Nor has the EEOC submitted any evidence to demonstrate how many applications were offered to or accepted by Southern Haulers with respect to the Calera terminal or the Decatur terminal.

Other than the administrative duties performed by, *inter alia*, the Corporate Security Director of Southern Haulers, the record is devoid of any evidence that each of these separate terminal did not operate entirely independently. Rather, the evidence reflects that each terminal was managed by its own terminal manager who alone determined, based on customer need, how many truck drivers were needed at that terminal (Doc. 109-1 at 15), and who alone was responsible for advertising for any open positions available at that terminal (Doc 109-1 at 19). Reed testified that:

> "Each terminal manager works autonomously from everyone else in determining whether he has enough trucks filled by drivers to handle the freight our of his terminal, as each terminal operates independently of the other terminals because we're regional. You know, we're small regional carriers. Each terminal manager knows what freight he has and if he has enough men or filled trucks to handle that freight. If he has excess freight and needs drivers then he takes applications to fill those trucks.

(Doc. 109-1 at 19). Reed further testified that, although a driver may request a transfer to another terminal, the terminals do not share drivers because the trucks are day cabs that

do not have sleepers and each truck is maintained and fueled at each respective terminal. (Doc. 109-1 at 19).

The evidence of record also demonstrate that no person either applied for employment, or was hired as a truck driver at the Brewton terminal between the time that five drivers were hired for the Brewton terminal in 2008, of whom two were African-American drivers, Lamont Holland and James Durant, and the hiring of three drivers in January, April and May of 2010, respectively, following the acquisition of a new customer, Schnitzer Southeast, in January 2010.[35] The three drivers referred to by the EEOC as being hired at the "Brewton facility" included: (1) Thomas "Josh" Brown, who submitted his application on January 7, 2010, and was hired on February 1, 2010; (2) Thomas "Rocky" Burch, who submitted an application on March 17, 2010, and was hired on April 13, 2010; and (3) Reo Pugh, who submitted his application on April 19, 2010 and was hired on May 5, 2010. Consequently, there is no evidence of record to demonstrate that any application was taken or that any truck driver was hired at the Brewton terminal throughout 2009, or within even six months of the alleged phone inquiry by Kelly at some unspecified date in June 2009. As compared to Williams' claim, the first application for a truck driver position was not accepted until nearly nine months after Williams' in-person inquiry at the Brewton terminal on April 14, 2009. There is, therefore, no evidence that Southern Haulers was accepting applications or kept

[35] Although Thomas Brown claimed to have submitted an application in 2008 even though he was told they were not hiring, there is no evidence as to precisely when he submitted this application and no evidence that it was held more than ninety days as was the custom. A reasonable inference must be that the 2008 application no longer existed when Brown was given the opportunity to submit an application on January 7, 2010. (Doc. 109-3 at30; Doc. 115 at p. 23 ¶ 90).

a truck driver position open at the Brewton terminal at the time Williams inquired about such positions in-person on April 14, 2009, or thereafter throughout the remainder of 2009 and until Southern Haulers acquired a new customer in January 2010.

The EEOC argues that the failure of Williams and Kelly to formally apply is of no consequence because they "did everything reasonably possible to make Southern Haulers know of their interest in applying for the job of truck driver." (Doc. 115 at p. 29). The EEOC specifically alleges that plaintiffs established their prima facie case "when they showed, *inter alia*, that "they did everything within their power to apply for employment." *Id*., *citing* Furnco Const. Corp. v. Waters, 438 U.S. 567, 576 (1978). The EEOC omits, however, under the rubric "*inter alia,*" a relevant portion of the Furnco decision. The elements of a prima facie case cannot be taken out of context in this manner. The Supreme Court held as follows in Furnco:

> *McDonnell Douglas* did make clear that a Title VII plaintiff carries the initial burden of showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were "based on a discriminatory criterion illegal under the Act." [Citations omitted] And here respondents carried that initial burden by proving they were members of a racial minority; they did everything within their power to apply for employment; Furnco has conceded that they were qualified in every respect for ***the jobs which were about to be open***; [Footnote omitted] they were not offered employment . . .; and the ***employer continued to seek persons of similar qualifications***.

438 U.S. at 576 (emphasis added). In this case it is undisputed that Southern Haulers lost its business in August 2008 with the Biloxi, Mississippi transfer station and, in the first quarter of 2009, lost its business with the Prattville, Alabama transfer station, both of which were service by the Brewton terminal. *See* Findings 9-11, *supra*. Although the EEOC maintains that such a loss of business is irrelevant/immaterial, even when it results

in some drivers being sequestered (i.e. placed on four-day workweeks as an alternative to layoffs),[36] no legal support has been offered for the proposition that the Court may infer racial discrimination from the failure of a company to accept applications and/or hire at a time when it has lost business, does not need any new employees, and does not know when it might gain new business and require new employees. Here, the first new customer was not acquired until January 2010. *See* Finding # 20, *supra*. Neither Williams nor Kelly ever contacted Southern Haulers about available truck driving positions after their initial inquiries in April 2009 and June 2009, respectively. Even if they had been permitted to submit an application at the time of their inquiry when there was no open position and it was uncertain when a new customer would be acquired, those applications would have been discarded approximately ninety days afterwards, well before circumstances changed at the Brewton terminal. *See* Finding # 5, supra. See *also*, McCaslin v. Birmingham Museum of Art, 384 Fed.Appx. 871, 874 (11th Cir. 2010) (Affirmed district court's conclusion that plaintiff failed to satisfy the second prong a prima facie case because "it is unreasonable to infer that [plaintiff's] 1999 letter to the [defendant] was an application for a position filled almost seven years later.").[37] Consequently, viewing the evidence in the light most favorable to the plaintiff, the EEOC has failed to establish a prima facie case of discrimination.

---

[36] *See* Finding # 10, *supra*.

[37] The Eleventh Circuit also addressed the issue of whether a plaintiff must show that she applied for the position when an employer fails to announce a position formally and instead uses informal and subjective procedures to identify a candidate. McCaslin, 384 Fed.Appx. at 874). The Eleventh Circuit held that plaintiff "only has to prove that the employer had 'some reason' to consider her for the position." *Id*., *citing* Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 768 (11th Cir.2005).

(2 Legitimate Nondiscriminatory Reason.

Even assuming that the EEOC has established a prima facie case, the defendant has articulated a legitimate, nondiscriminatory reason for its actions. Southern Haulers' burden, once a prima facie case of discrimination is established, is to "articulate a non-discriminatory reason" for failing to hire Williams and Kelly, but this burden is "a burden of production, not of persuasion." Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 769 (11th Cir.2005), *citing* Burdine, 450 U.S. at 254. *See also* St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993)( "[T]he defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action."). Southern Haulers' burden has been described as being "exceedingly light," because, "[s]o long as the employer articulates a clear and reasonably specific non-discriminatory basis for its actions, it has discharged its burden of production." Lane v. Broward County, Florida, 411 Fed.Appx. 272, 274 (11th Cir. 2011), *quoting* Vessels, 408 F.3d at 769–70.

Southern Haulers has asserted that, at the time of Williams and Kelly's inquiry into a truck driving position at the Brewton terminal, no applications were being accepted because there were no truck driving positions available at the Brewton terminal. There were no truck driving positions available at the Brewton terminal because Southern Haulers lost its business with the Biloxi, Mississippi transfer station in August 2008 (Doc. 109-3 at 32); in the first quarter of 2009, Southern Haulers lost its business with the Prattville, Alabama transfer station when the station was hit by a tornado (Doc. 109-3 at 17-8, 32); and, starting in late November or early December 2008 and continuing through

2009, Southern Haulers' revenue was down about thirty-five percent due to the loss of business and the poor economy (Doc. 109-1 at 39).

(2) Pretext.

The burden now shifts to the EEOC to demonstrate that the aforementioned non-discriminatory reason articulated by Southern Haulers for not hiring Williams and Kelly was pretextual. The evidence in this record demonstrates that no person either applied for employment, or was hired as a truck driver at the Brewton terminal between the time five drivers were hired for the Brewton terminal in 2008, among whom were two African-American drivers, Lamont Holland and James Durant, and the hiring of three drivers in January, April and May of 2010, respectively, following the acquisition of a new customer, Schnitzer Southeast, in January 2010. The attempt by Williams in person and Kelly by phone to obtain permission to submit an application when there existed no open positions for truck driver does not alter the legitimacy of the non-discriminatory reason articulated by Southern Haulers, regardless of how rudely Williams and Kelly believe Triezenberg may have treated them. "Title VII, as it has been aptly observed, is not a 'general civility code[,]' " Gupta [v. Florida Bd. of Regents, 212 F.3d 571, 583 (11th Cir. 2000) (*quoting* Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)])(quotation altered), and it "does not operate as a general ban on ... rude or offensive behavior.' " Leslie v. Cumulus Media, Inc., 814 F.Supp.2d 1326, 1343 (S.D.Ala.2011) (quoting Weaver v. Potter, No. CV 110–005, 2010 WL 2465423, at *4 (S.D.Ga. Apr. 21, 2010) (citation omitted)).

In Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 120 (2000), the Supreme Court clarified that a prima facie case of discrimination, combined with

evidence from which a jury could conclude that an employer's proffered justification was false, supported an inference of discrimination sufficient to defeat summary judgment. In other words, a plaintiff is not required to provide additional evidence that race was the true reason for the employment decision. The Court further explained as follows:

> Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it can be quite persuasive. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.... Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. Thus, a plaintiff's prima facie case, combined with sufficient evidence to find the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

530 U.S. at 147–48 (citations omitted). *See also*, Conroy v. Abraham Chevrolet-Tampa, Inc., 375 F.3d 1228, 1236 (11th Cir. 2004)(Summary judgment for a defendant is impermissible "where the plaintiff, after satisfying the requirements of a prima facie case, presented evidence that the defendant's proffered explanation was pretextual."), *citing* Reeves, 530 U.S. at 146-49.

The EEOC acknowledges that it "bears the ultimate burden of proving that defendant intentionally discriminated against him." Doc. 115 at 35, *citing* Hicks, 509 U.S. at 509-11; Glidden v. County of Monroe, 950 F.Supp. 73, 75 (W.D. N.Y. 1997). The EEOC further states that it "may demonstrate Defendants' reasons were pretextual by revealing such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in their proffered legitimate reasons for their actions that a reasonable factfinder could find them unworthy of credence." Doc. 115 at 35, *citing* Cooper v.

Southern Co, 390 F. 3d 695, 725 (11th Cir. 2004)("[P]laintiff must present 'sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged action'."). The EEOC relies on "the same evidence used to establish the prima facie case." (Doc. 115 at 36).

The EEOC asserts that Southern Haulers contention that "there were no available positions at the Brewton Terminal" is unworthy of belief because "it hired, in total, thirty-four (34) drivers, in close temporal proximity to when Williams and [Kelly] made employment inquiries." (Doc. 115 at 36). As stated previously, the evidence of record demonstrates only that three drivers were hired for the Brewton terminal more than six months following the last inquiry by Kelly via the telephone. No drivers were hired at the Brewton terminal in 2009.

The EEOC next argues that, "[m]ore telling [] is that Southern Haulers hired three (3) white drivers during a time when business was slow at the Brewton terminal." (Doc. 115 at 36). Although the EEOC contends that the loss of business affecting the Brewton terminal was irrelevant/immaterial, it argues that it is nonetheless relevant to showing pretext. The EEOC has failed to explain, however, how the employment of three drivers to accommodate the acquisition of one new customer in January 2010 makes the contention that "business [is] slow" an actionable falsity when it is undisputed that Southern Haulers lost two customers in late 2008 and early 2009 which led to the decision not to accept any applications or hire any drivers for the Brewton terminal throughout 2009. The EEOC has proffered no evidence to substantiate its claim that business was not still "slow" when the three drivers were hired in 2010. Even if Southern Haulers and Triezenberg could be found to be negligent in somehow failing to anticipate

the acquisition of a new customer in 2010, such is not evidence of intentional discrimination.

The EEOC also argues that Triezenberg "intentionally manipulated applicant flow data for the benefit of white candidates and to the prejudice of Williams and the class by controlling when or if a person could apply for employment with Southern Haulers." (Doc. 115 at 38). The EEOC bases this contention on two grounds. The EEOC first contends that "Triezenberg testified that he sometimes held on to applications longer [than 90 days]." (Doc. 115 at 37). However, there is no evidence that any truck driver was ever hired based on an application received by Triezenberg during a time defendant was not hiring drivers but held onto for more than ninety days, including Thomas Brown. *See* Finding # 11, n. 15, *supra*.

The EEOC also contends that "[a]nother irregularity in the hiring process includes Defendant's use of word of mouth recruitment." (Doc. 115 at 38), *citing* Barnett v. W.T. Grant Co., 518 F.2d 543, 550 (4th Cir. 1975)("Subjective word-of-mouth hiring methods are suspect because of their propensity for "masking racial bias….,"). There is no evidence in this case that any truck driver was hired to work at the Brewton terminal during 2009 or that a truck driver position was available at any time during 2009. If Southern Haulers had hired a truck driver for the Brewton terminal in 2009 without properly advertising the open position, their "word of mouth recruitment" of that new employee might well be grounds to infer discriminatory intent in failing to hire Williams or Kelly. As dangerous as the "word of mouth" practice may be, it is not evidence of pretext in this case.

The EEOC's final argument is relates to purely statistical evidence. The EEOC specifically alleges that "Defendant's 2009 EEO-1 report for the Brewton terminal shows only 1 black and 23 whites, in a labor market that is 31% black" and that "a jury could infer from these statistics a finding of pretext." (Doc. 115 at 40). The EEOC has acknowledged, however, that "the Supreme Court has cautioned 'that statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all the surrounding facts and circumstances'." (Doc. 115 at 33, *citing* Wilkins v. University of Houston, 654 F.2d 388, 395 (5th Cir. 1981)). The Eleventh Circuit has also expressed its "difficulty with statistical evidence," as follows:

> One difficulty with statistical evidence is that it may raise more questions than it answers. This Court reached that conclusion in Wilkins v. University of Houston, 654 F.2d 388 (5th Cir. Unit A 1981). In Wilkins this Court held that "[m]ultiple regression analysis is a relatively sophisticated means of determining the effects that any number of different factors have on a particular variable." *Id*. at 402-03. This Court noted that the methodology "is subject to misuse and thus must be employed with great care." *Id*. at 403. Procedurally, when multiple regression is used "it will be the subject of expert testimony and knowledgeable cross-examination from both sides. In this manner, the validity of the model and the significance of its results will be fully developed at trial, allowing the trial judge to make an informed decision as to the probative value of the analysis." Id. Having done this, the Wilkins Court, in an employment discrimination case, held "the statistical evidence associated with the multiple regression analysis is inconclusive, raising more questions than it answers." *Id*.
>
> Even if the statistical evidence is strong there is generally a need for additional evidence. In Wade v. Mississippi Cooperative Extension Serv., 528 F.2d 508 (5th Cir.1976), the results drawn from the multi-variate regression analysis were supported by additional evidence. *Id*. at 517. In Wade the statistics did not "stand alone" as the sole proof of discrimination.

McCleskey v. Kemp, 753 F.2d 877, 889 (11th Cir. 1985). Even beyond the questionable nature of statistics in general, statistical evidence is often deemed relevant only to class claims alleging a pattern or practice of discrimination. *See e.g.* Wilkins,

654 F.2d at 394-95. In addition, the Wilkins Court held that only "where the statistical showing is sufficiently strong in a disparate treatment action, [can] plaintiffs' prima facie case [] be made without additional evidence establishing that defendant purposefully treated minorities protected under Title VII less favorably than other persons." 654 F.2d at 395. No such statistical showing has been made in this case. *See e.g.* Bennett v. Nucor Corp., 656 F.3d 802, 818 (8th Cir. 2011)( "[A] bare assertion of racial imbalances in the workforce is not enough to establish a Title VII disparate impact claim. The plaintiffs must show that the employer 'uses a particular employment practice that causes a disparate impact'."); Medley v. Department of Justice of Louisiana, 425 Fed.Appx. 369, 373 (5th Cir. 2011) ("[I]n the usual case, the statistical analysis at issue should be evaluated in light of all the evidence presented by the parties as well as in light of the plaintiff's ultimate burden to prove by a preponderance of the evidence that she was the victim of discrimination."); Turner v. Public Service Co. of Colorado, 563 F.3d 1136, 1147 (10th Cir. 2009)("[I]n order for statistical evidence to create an inference of discrimination, the statistics must show a significant disparity and eliminate nondiscriminatory explanations for the disparity. In other words, a plaintiff's statistical evidence must focus on eliminating nondiscriminatory explanations for the disparate treatment by showing disparate treatment between comparable individuals."); Foxworth v. Pennsylvania State Police, 228 Fed.Appx. 151, 156 (3rd Cir. 2007)(With respect to a disparate treatment or impact claim, "it is not enough for a plaintiff to show 'that there are statistical disparities in the employer's workforce;' rather a plaintiff must also prove causation."); Burke-Fowler v. Orange County, Fla., 447 F.3d 1319, 1325 (11th Cir. 2006) ("[H]olding employers liable for statistical imbalances per se is inconsistent with Title

VII's plain language and statutory purpose.")(quoting EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1276 (11th Cir.2000)).

In view of the other substantial evidence already discussed in this case concerning the lack of truck driver positions at the Brewton terminal in 2009, the EEOC's statistical proffer, even if taken at face value, is insufficient to support any declaration that Southern Haulers' articulated non-discriminatory reason for failing to hire, or even to accept an application from, either Williams or Kelly in 2009 is pretextual.

CONCLUSION and ORDER[38]

In accordance with the foregoing, it is **ORDERED** that Southern Hauler's motion for summary judgment is **GRANTED**. In view of this order, it is **FURTHER ORDERED** that the EEOC's motion for partial summary judgment is hereby **DENIED** as **MOOT**.

As provided in Rule 58 of the Federal Rules of Civil Procedure, **Judgment** shall be entered by separate document.

**DONE** this 10th day of April, 2013.

/s/ Katherine P. Nelson
**KATHERINE P. NELSON**
**UNITED STATES MAGISTRATE JUDGE**

[38] It is unnecessary for the Court to address defendant's claims that Williams has not mitigated his damages and that Kelly is not entitled to backpay. For the reasons stated above, the Court concludes that Southern Hauler's motion for summary judgment is due to be granted.